UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BANYAN CAY RESORT FUND, LLC | : |
|                  Plaintiff, | : |
| | : |
|    v. | : |
| | : |
| U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP, | : |
|                  Defendants. | : |

Case No:

**COMPLAINT**

     Plaintiff, Banyan Cay Resort Fund, LLC ("**Plaintiff**" or "**Mezzanine Lender**"), by and through its attorneys, White and Williams LLP, by way of Complaint against U.S. Real Estate Credit Holdings III-A, LP ("**Defendant**" or "**Senior Lender**"), alleges, on personal knowledge as to its own actions and on information and belief as to all other allegations, as follows:

## NATURE OF THE ACTION

     1.    This action arises from covenants by and between the Senior Lender and Mezzanine Lender as set forth in certain intercreditor agreements related to financing provided by both the Senior Lender and Mezzanine Lender for the development of projects that were to be completed by the Borrowers (as defined below), including, among other things, a hotel, resort, estate lots and golf villas in West Palm Beach, Florida. The parties worked jointly to initially finance these endeavors; however, when construction issues arose and Borrowers defaulted on their loan agreements, the Senior Lender acted unilaterally to preserve its interests to the detriment of the Mezzanine Lender. This included the impermissible and substantial increase of the principal amount of the Senior Lender's loans and the continued refusal by the Senior Lender to provide documents to the Mezzanine Lender. The Senior Lender's violations of the intercreditor agreements have damaged and are continuing to damage the Mezzanine Lender by materially prejudicing and impairing its rights and security interests in the collateral securing the mezzanine

loan and, in turn, its ability to fully recover all outstanding indebtedness owed to the Mezzanine Lender under the mezzanine loan documents.

## PARTIES

2.     Plaintiff, Banyan Cay Resort Fund, LLC, is a limited liability company organized and existing under the laws of the State of Florida, having an office at c/o American Immigration Group, LLC, 1298 Park Street, Atlantic Beach, NY 11509.

3.     The managing member of Plaintiff is Banyan Cay Resort Find Management, LLC, a Florida limited liability company, whose sole member is David Finkelstein, residing in Atlantic Beach, New York.

4.     Plaintiff also has ten Series A members who reside outside of the United States as follows:

| Names | Location of Residence |
|---|---|
| Amed Yehya | Jeddah, Saadia Arabia |
| Angelica Nouhi | Pioltello, Italy |
| Charlotte Mcculagh | London, United Kingdom |
| Chengari Kalyankrishna | Nellore, India |
| Chengari Vipin Krishna | Nellore, India |
| Elbahlool Khalid Masoud | Istanbul, Turkey |
| Eleanora Bobyleva | Moscow, Russia |
| Habaj El Houssaine | Toual Meknès, Morocco |
| Vallamate Sai Harsha | Bentonville, Arkansas |
| Viola Melpigano | Brindisi, Italy |

5.     Defendant U.S. Real Estate Credit Holdings III-A, LP is an Irish limited partnership, having an office at c/o Calmwater Capital, 507 S. Douglas St., 2nd Floor, El Segundo, CA 90245.

6.     Upon information and belief: (a) the sole limited partner of the Defendant is U.S. Real Estate Credit Master Sub-Fund III-A (the "**Limited Partner**"); (b) the Limited Partner is an Irish sub-fund (i) authorized under section 19 of the Irish Collective Asset-Management Vehicles

Act of 2015, and (ii) approved by the Central Bank of Ireland as a closed-ended investment fund of U.S. Real Estate Credit Mast Fund III ICAV ("**USRE Fund**"); and (c) the Limited Partner has a principal place of business in Dublin, Ireland.

7.      Upon information and belief, USRE Fund is an Irish variable capital investment company which provides facilities for the direct or indirect participation by the public and which is authorized under section 256(5) of the Companies Act, 1990, Part XIII, and has a principal place of business in Dublin, Ireland.

8.      Upon information and belief: (a) the general partner of the Defendant is U.S. Real Estate Credit Holdings III-A GP Limited (the "**General Partner**"); and (b) the General Partner is a private company or corporation limited by shares formed in Ireland with a principal place of business in Dublin, Ireland.

## JURISDICTION AND VENUE

9.      There is complete diversity of citizenship between the parties in this action and their respective partners and members. This is an action between citizens of different states, or citizens of a state and citizens of a foreign state.

10.      The amount in controversy in this matter is in the amount of $5,000,000, exclusive of interest and costs.

11.      Accordingly, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) or (a)(2).

12.      The Senior Lender agreed to submit to the personal jurisdiction of this Court and that this Court is the proper venue of this action.  As set forth in Section 36 of the Intercreditor Agreements (as defined below), the Senior Lender agreed that "[a]ny legal suit, action or proceeding against Senior Lender … arising out of or relating to [the Intercreditor] Agreement

shall be instituted in any federal or state court in New York, and Senior Lender … waives any objection which it may now or hereafter have to the laying of venue of any such suit, action, or proceeding, and … irrevocably submits to the jurisdiction of any such court in any suite, action or proceeding."

13.     This Court has authority to hear causes of action seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202.

<u>**FACTS COMMON TO ALL CLAIMS**</u>

14.     Banyan Cay Resort & Golf, LLC and Banyan Cay Dev. LLC (collectively, the "**Hotel Borrowers**") hold title to that certain real property located in West Palm Beach, Florida as more fully described on **Exhibit 1** and all improvements thereon (the "**Hotel Property**"), which included fifty-two (52) estate lots (the "**Estate Lots**").

15.     Upon information and belief, the Hotel Borrowers do not have any other assets other than the Hotel Property.

16.     Banyan Cay Villas, LLC (the "**Villas Borrower**" and together with the Hotel Borrowers, collectively, the "**Borrowers**") holds title to that certain real property located in West Palm Beach, Florida as more fully described on **Exhibit 2** and all improvements thereon (the "**Villas Property**" and together with the Hotel Property, collectively, the "**Borrowers' Properties**").

17.     Upon information and belief, the Villas Borrower does not have any other assets other than the Villas Property.

18.     Banyan Cay Mezzanine Borrower, LLC (the "**Parent Company**" or "**Mezzanine Borrower**") is the direct legal and beneficial owner of one hundred percent (100%) of the issued and outstanding limited liability company interests in each of the Borrowers, together with all

certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by each of the Borrowers to the Parent Company (collectively, the "**Pledged Company Interests**").

19.     Upon information and belief, the Parent Company does not have any other assets other than the Pledged Company Interests.

20.     Upon information and belief, the principal assets of the Pledged Entities are the Borrowers' Properties comprising the planned resort and residential development commonly known as Banyan Cay Resort & Golf, Banyan Cay Estates and Banyan Cay Golf Villas, all located in West Palm Beach, Florida.

21.     Upon information and belief, Pledged Entity Banyan Cay Resort & Golf, LLC owns part of the Hotel Property known as the Banyan Cay Resort & Golf Club comprising a nearly complete 150-key resort hotel, an operating 18-hole golf course designed by Jack Nicklaus and other to be completed amenities, all located at 2020 Banyan Resort Way in West Palm Beach, Florida.

22.     Upon information and belief, Pledged Entity Banyan Cay Dev. LLC owns part of the Hotel Property in West Palm Beach, Florida comprising (a) an unimproved lot approved for construction of a high-rise multi-family condominium building up to 20 stories and 179 units, and (b) 33 single family estate lots located on Gin Berry Way, Safflower Circle and Bellflower Circle.

23.     Upon information and belief, Pledged Entity Banyan Cay Villas, LLC owns the Villas Property commonly known as the Banyan Cay Golf Villas comprising 22 to be constructed resort golf villas available for sale located on Banyan Villa Circle in West Palm Beach, Florida.

**Initial Senior Lender Loan Agreements**

24.     On or about September 30, 2020, the Senior Lender entered into that certain Amended and Restated Loan Agreement (the "**Original Hotel Loan Agreement**") for a loan in the original principal amount of up to $61,000,000 (the "**Hotel Loan**") with the Hotel Borrowers. A true and correct copy of the Original Hotel Loan Agreement is attached hereto as **Exhibit 3**.

25.     As set forth in section 2.2 of the Original Hotel Loan Agreement, all sums due and owed under the Original Hotel Loan Agreement were required to be repaid, in full, by September 30, 2022 (the "**Original Maturity Date**").

26.     The Hotel Loan is evidenced by that certain Amended, Restated and Future Advance Promissory Note, dated as of September 30, 2020, made by Hotel Borrowers to the Senior Lender in the amount of the Hotel Loan (the "**Hotel Note**"), and is secured by, among other things, an Amended and Restated Mortgage, Security Agreement, dated as of September 30, 2020, made by Hotel Borrowers in favor of the Senior Lender (the "**Hotel Mortgage**") which encumbers the Hotel Property.

27.     The Hotel Loan is also secured by the Second Priority Mortgage, Security Agreement and Financing Statement (Golf Villas Property for Hotel Loan), dated as of September 30, 2020, made by the Villas Borrower (the "**Second Priority Mortgage for Hotel Loan**"), which encumbers the Villas Property.  A true and correct copy of the Second Priority Mortgage for Hotel Loan is attached hereto as **Exhibit 4**   The Second Priority Mortgage for Hotel Loan and Hotel Mortgage are hereinafter collectively referred to as the "**Hotel Loan Mortgages**".

28.     The Hotel Loan is further secured by an Amended and Restated Indemnity and Guaranty Agreement, dated as of September 30, 2020, executed by Domenic J. Gatto, Jr. in favor

the Senior Lender (the "**Senior Hotel Loan Guaranty**").  A true and correct copy of the Senior Hotel Loan Guaranty is attached hereto as **Exhibit 5**.

29.     The Senior Lender and Hotel Borrowers also entered into that certain Amended and Restated Partial Release Agreement, dated as of September 30, 2020 (the "**Partial Release Agreement**"), which, among other things, permits the Hotel Borrowers to sell the Estate Lots in accordance with the requirements of the Partial Release Agreement.

30.     Under the Partial Release Agreement, the Net Sale Proceeds (as defined in the Partial Release Agreement) from the sale of the Estate Lots were to be applied to, among other things, the principal balance and unpaid interest under the Original Hotel Note.

31.     On or about September 30, 2020, the Senior Lender and the Villas Borrower entered into that certain Loan Agreement (the "**Original Villas Loan Agreement**") for a loan in the original principal amount of up to $19,000,000 (the "**Villas Loan**").  A true and correct copy of the Original Villas Loan Agreement is attached hereto as **Exhibit 6**.  The Villas Loan and the Hotel Loan are hereinafter collectively referred to as the "**Senior Loans**".

32.     The Villas Loan is evidenced by a certain Future Advance Promissory Note (Golf Villas Loan), dated as of September 30, 2020, made by the Villas Borrowers to the Senior Lender in the amount of up to the Villas Loan (the "**Villas Note**"), and is secured by, among other things, that certain Mortgage, Security Agreement, dated as of September 30, 2020, made by the Villas Borrower in favor of the Senior Lender (the "**Villas Mortgage**"), which encumbers the Villas Property.  True and correct copies of the Villas Note and Villas Mortgage are attached hereto as **Exhibit 7** and **Exhibit 8**, respectively.

33.     The Villas Loan is also secured by the Second Priority Mortgage, Security Agreement and Financing Statement (Hotel Property for Golf Villas Loan), dated as of September

30, 2020, made by the Hotel Borrowers (the "**Second Priority Mortgage for Villas Loan**" and together with the Second Priority Mortgage for the Hotel Loan, collectively, the "**Second Priority Mortgages**"), which encumbers the Hotel Property.  A true and correct copy of the Second Priority Mortgage for Villas Loan is attached hereto as **Exhibit 9**.  The Villas Mortgage and the Second Priority Mortgage for the Villas Loan are hereinafter collectively referred to as the Villas Loan Mortgages.

34.     The Villas Loan is further secured by an Indemnity and Guaranty Agreement, dated as of September 30, 2020, executed by Domenic J. Gatto, Jr. in favor the Senior Lender (the "**Senior Villas Loan Guaranty**").  A true and correct copy of the Senior Villas Loan Guaranty is attached hereto as **Exhibit 10.**

**The Mezzanine Loan**

35.     On or about October 15, 2020, the Mezzanine Lender and the Parent Company entered into that certain Mezzanine Loan Agreement (the "**Mezzanine Loan Agreement**") for a loan in the original principal amount of up to $60,000,000 (the "**Mezzanine Loan**").  A true and correct copy of the Mezzanine Loan Agreement is attached hereto as **Exhibit 11**.

36.     The Mezzanine Loan is evidenced by a certain Mezzanine Loan Promissory Note, dated as of October 15, 2020, made by the Parent Company to the Mezzanine Lender in the amount of up to the Mezzanine Loan (the "**Mezzanine Note**"), and is secured by, among other things, that certain Pledge and Security Agreement, dated as of October 15, 2020, made by the Parent Company in favor of Mezzanine Lender (the "**Pledge Agreement**"), pursuant to which the Mezzanine Lender was granted a first priority security interest in all Pledged Company  and the other collateral set forth in Section 2(ii) – (v) of the Pledge Agreement (collectively, the "**Pledged**

**Interests**").  True and correct copies of the Mezzanine Note and Pledge Agreement are attached hereto as **Exhibit 12** and **Exhibit 13**, respectively.

37.     The Mezzanine Loan is further secured by a Mezzanine Indemnity and Guaranty Agreement, dated as of October 15, 2020, executed by Domenic J. Gatto, Jr. (the "**Mezzanine Loan Guarantor**") in favor the Mezzanine Lender (the "**Mezzanine Loan Guaranty**").  A true and correct copy of the Mezzanine Loan Guaranty is attached hereto as **Exhibit 14**.

38.     The Borrowers executed and delivered to the Mezzanine Lender that certain Acknowledgement and Consent (the "**Consent**"), dated as of October 15, 2020, as well as that certain Confirmation Statement and Instruction Agreement, dated October 15, 2020 (the "**Confirmation Statement**"), pursuant to which each of the Borrowers, among other things, acknowledged the Mezzanine Lender's security interests in the Pledged Interests and agreed to comply with the terms and provisions thereof.  True and correct copies of the Consent and Confirmation Statement are attached hereto as **Exhibit 15** and **Exhibit 16**, respectively.

39.     Pursuant to the Pledge Agreement and the Mezzanine Loan Agreement, the Mezzanine Lender is entitled to any distributions and payments that the Parent Company receives from the Borrowers after there has been an Event of Default under the Mezzanine Loan Agreement. *See* Exhibit 11, Mezzanine Loan Agreement, §§2.6 and 3.1; Exhibit 13, Pledge Agreement, §7.

40.     At the time the Mezzanine Loan Agreement was entered into, the Mezzanine Lender advanced to the Mezzanine Borrower the principal amount of $5,000,000.00 thereunder.

41.     The Mezzanine Borrower has made no payments to the Mezzanine Lender to paydown the outstanding principal amount of $5,000,000.00 due and owed under the Mezzanine Loan Agreement and the Mezzanine Note.

**The Intercreditor Agreements**

42.     On or about October 15, 2020, the Senior Lender and the Mezzanine Lender entered into that certain Intercreditor Agreement, dated October 15, 2020, to provide for, among other things, the relative priority between the Hotel Loan and the Mezzanine Loan (the "**Hotel Intercreditor Agreement**").   A true and correct copy of the Hotel Intercreditor Agreement is attached hereto as **Exhibit 17**.   As used in this Complaint, the term "**Hotel Loan Documents**" means the Senior Loan Documents (as defined in the Hotel Intercreditor Agreement).

43.     On or about October 15, 2020, the Senior Lender and the Mezzanine Lender entered into that certain Intercreditor Agreement, dated October 15, 2020, to provide for, among other things, the relative priority between the Villas Loan and the Mezzanine Loan (the "**Villas Intercreditor Agreement**" and together with the Hotel Intercreditor Agreement, collectively, the "**Intercreditor Agreements**").  A true and correct copy of the Villas Intercreditor Agreement is attached hereto as **Exhibit 18**.  As used in this Complaint, the term "**Villas Loan Documents**" means the Senior Loan Documents (as defined in the Villas Intercreditor Agreement).  Capitalized terms used but not defined in this Complaint have the meanings assigned to them in the Intercreditor Agreements, as applicable.

44.     The Hotel Intercreditor Agreement and the Villas Intercreditor Agreement prohibit the Senior Lender from modifying the Hotel Loan Documents and the Villas Loan Documents, respectively, to, among other things, increase the principal amount of the Hotel Loan or the Villas Loan, respectively, materially increase any monetary obligations of the Hotel Borrower or the Villas Borrower, respectively, or shorten the maturity date of the Hotel Loan or the Villas Loan, respectively, without the consent of the Mezzanine Lender.

45.     Specifically, Section 7(a) of the Hotel Intercreditor Agreement and Villas Intercreditor Agreement provides the following with regard to modifications and amendments to the Hotel Loan Documents or the Villas Loan Documents, respectively:

> Senior Lender shall have the right without the consent of the Mezzanine Lender in each instance to enter into any amendment deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Senior Loan Modification") provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan, (ii) increase in any other material respect any monetary obligations of Borrower[s] under the Senior Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower[s] to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents)…(vii) cross default the Senior Loan with any other indebtedness….

*See* Exhibit 17, Hotel Intercreditor Agreement, § 7(a); and Exhibit 18, Villas Intercreditor Agreement, § 7(a).

46.     Section 7(c) of the Hotel Intercreditor Agreement and Villas Intercreditor Agreement provides the following with regard to modifications and amendments to the Hotel Loan Documents or the Villas Loan Documents, respectively:

> Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one of more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any such applicable instruments have been executed by Senior Lender.

*See* Exhibit 17, Hotel Intercreditor Agreement, § 7(c); and Exhibit 18, Villas Intercreditor Agreement, § 7(c).

**Senior Lender's Foreclosure Action**

47.     On or about July 16, 2022, the Senior Lender filed a Verified Complaint (the "**Foreclosure Complaint**") against the Borrowers, and certain other parties (collectively, the "**Foreclosure Defendants**") in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida (the "**State Court**"), Case No. 50-2022-CA-006815-XXXX-MB (Div. AA) (the "**Foreclosure Action**").   A true and correct copy of the Foreclosure Complaint without exhibits is attached hereto as **Exhibit 19**.

48.     In the Foreclosure Action the Senior Lender (a) asserts claims for breaches of the Hotel Loan Documents and the Villas Loan Documents as modified by certain amendments thereto that the Senior Lender failed to provide to the Mezzanine Lender or obtain the Mezzanine Lender's written consent to, (b) seeks to foreclose on and enforce the Senior Lender's mortgages and liens encumbering the Borrowers' Property, personal property, leases and rents, and (c) seeks to enforce various personal guarantee agreements with respect to the Hotel Loan and the Villas Loan executed by Domenic J. Gatto, Jr. – who is also the Mezzanine Loan Guarantor.

49.     In response to the Mezzanine Lender's written request, in December 2022, the Senior Lender sent the Mezzanine Lender a Loan Payoff Statement (the "**Senior Loan Payoff Statement**") stating that, as of December 8, 2022, the estimated total amount to pay off the Hotel Loan and Villas Loan was $93,346,845.89.  A true and correct copy of the Senior Loan Payoff Statement is attached hereto as **Exhibit 20**.

50.     On January 19, 2023, the Senior Lender filed a *Motion for Entry of Supplemental "order to Show Cause" Pursuant to Section 702.10, Florida Statutes* (the "**Final Judgment Motion**") requesting the State Court to modify its Order to Show Cause why the State Court should not enter a Final Judgment of Foreclosure in favor of the Senior Lender that provides for: (i) a

judgment against certain of the Foreclosure Defendants, including the Hotel Borrowers, in the amount of $63,147,816.23 and for the subsequent foreclosure sale of the Hotel Property to satisfy the judgment against the Hotel Borrower; and (ii) a judgment against certain of the Foreclosure Defendants, including the Villas Borrower, in the amount of $30,295,615.91 and for the subsequent foreclosure sale of the Villas Property to satisfy the judgment against the Villas Borrower.  A true and correct copy of the Final Judgment Motion is attached hereto as **Exhibit 21**.

51.     The principal amounts owed on the Villas Loan reflected and requested in the Senior Loan Payoff Statement and the Final Judgment Motion are based upon the Senior Lender: (a) amending the Villas Loan Documents to, among other things, increase the principal amount of the Villas Loan from up to $19,000,000 to an amount up to $33,000,000; and (b) advancing the Villas Loan in the aggregate amount of at least $26,749,000.63.

52.     A hearing on the Final Judgment Motion before the State Court occurred on February 9, 2023 and it is anticipated the State Court will enter an order addressing the Final Judgment Motion shortly.

**Senior Lender Amendments to the Villas Loan Documents and the Hotel Loan Documents**

53.     On or about September 2, 2021, the Senior Lender and Borrowers entered into that certain First Amendment to Loan Agreement and Other Loan Documents (the "**First Amended Villas Loan Agreement**") to, among other things, amend the Original Villas Loan Agreement to: (a) provide for an increase in the principal amount of the Villas Loan and (b) to extend the maturity date of the Hotel Loan from the Original Maturity Date (i.e., September 30, 2022), to December 31, 2022.  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the First Amended Villas Loan Agreement is attached hereto as **Exhibit 22**.

54.     As set forth in Section 2(d) of the First Amended Villas Loan Agreement, the Senior Lender amended the Villas Loan Agreement to, among other things, increase the maximum principal amount of the Villas Loan to $24,000,000 – an increase of $5,000,000 from the original $19,000,000 provided for in the Original Villas Loan Agreement.

55.     The increase to the principal amount of the Villas Loan is further evidenced by that certain Amended and Restated Future Advance Promissory Note, dated as of September 2, 2021, made by Borrowers to the Senior Lender in the maximum principal amount of $24,000,000 (the "**First Amended Villas Note**"), and is purportedly secured by, among other things, that certain First Amendment to Mortgage and Other Loan Documents, dated as of September 2, 2021, made by the Borrowers in favor of the Senior Lender (the "**First Amended Villas Mortgage**").  True and correct copies of what the Senior Lender filed in the Foreclosure Action as the First Amended Villas Note and the First Amended Villas Mortgage are attached hereto as **Exhibit 23** and **Exhibit 24**, respectively.

56.     On or about September 2, 2021, the Senior Lender and Hotel Borrowers also entered into the First Amendment to Second Priority Mortgage and Second Priority Assignment of Leases and Rents (Hotel Property for Villas Loans), dated September 2, 2021 (the "**First Amended Second Priority Mortgage for Villas Loan**" and together with the First Amended Villas Loan Agreement, First Amended Villas Note, First Amended Villas Mortgage, and all other documents evidencing, securing or executed in connection with the First Amended Villas Loan Agreement are hereinafter referred to collectively as the "**First Villas Amendments**").  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the First Amended Second Priority Mortgage for Villas Loan is attached hereto as **Exhibit 25**.

57.     Upon information and belief, on or about December 31, 2021, the Senior Lender and Borrowers entered into that certain Amended and Restated Loan Agreement and Other Loan Documents (the "**Second Amended Villas Loan Agreement**") to, among other things, further amend the Original Villas Loan Agreement to: (a) provide for an increase in the principal amount of the Villas Loan and (b) to shorten the maturity date of the Villas Loan from December 31, 2022, to July 1, 2022.

58.     Despite the Mezzanine Lender's requests, the Senior Lender has not provided copies of the Second Amended Villas Loan Agreement; however, the further increase to the principal amount of the Villas Loan is evidenced by: (i) that certain Second Amended and Restated Future Advance Promissory Note, dated as of December 31, 2021, made by Borrowers to the Senior Lender in the maximum principal amount of $13,000,000 (the "**Second Amended Villas Note**"), and (ii) that certain Future Advance Promissory Note A-2 (Golf Villas Loan), dated as of December 31, 2021, made by Borrowers to the Senior Lender in the maximum principal amount of $20,000,000 (the "**Villas Future Advance Note**").   True and correct copies of what the Senior Lender filed in the Foreclosure Action as the Second Amended Villas Note and the Villas Future Advance Note are attached hereto as **Exhibit 26** and **Exhibit 27**, respectively.

59.     The Second Amended Villas Note and the Villas Future Advance Note are purportedly secured by, among other things, that certain Second Amendment to Mortgage and Other Loan Documents, dated as of December 31, 2021, made by the Borrowers in favor of the Senior Lender (the "**Second Amended Villas Mortgage**" and together with the Second Amended Villas Loan Agreement, Second Amended Villas Note, Villas Future Advance Note and all other documents evidencing, securing or executed in connection with the Second Amended Villas Loan Agreement are hereinafter referred to collectively as the "**Second Villas Amendments**"). A true

and correct copy of what the Senior Lender filed in the Foreclosure Action as the Second Amended Villas Mortgage is attached hereto as **Exhibit 28**.

60.     As set forth in Recital B of the Second Amended Villas Mortgage, the Second Villas Amendments were completed "to, among other things, shorten the Maturity Date of the [Villas] Loan, and evidence a new aggregate maximum principal [Villas] Loan amount of $33,000,000…".

61.     The Senior Lender never sought, nor received, consent from the Mezzanine Lender to the First Villas Amendments nor the Second Villas Amendments (collectively, the "**Villas Amendments**").

62.     The Senior Lender never delivered copies of the Villas Amendments to the Mezzanine Lender at the time they were executed or within a reasonable time thereafter.

63.     In addition to amending the Villas Loan without the Mezzanine Lender's consent, the Senior Lender and the Hotel Borrowers entered into that certain Second Amendment to Amended and Restated Loan Agreement and Other Loan Documents, dated September 2, 2021 (the "**Second Amended Hotel Loan Agreement**"), to, among other things, amend the Original Hotel Loan Agreement to extend the maturity date of the Hotel Loan from the Original Maturity Date (i.e., September 30, 2022), to December 31, 2022.  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Loan Agreement is attached hereto as **Exhibit 29**.

64.     The extension of the maturity date of the Hotel Loan is further evidenced by that certain Second Amended, Restated and Future Advance Promissory Note (Banyan Cay Resort), dated September 2, 2021, made by Hotel Borrowers to the Senior Lender (the "**Second Amended Hotel Note**"), and is purportedly secured by, among other things, that certain Second Amendment to Mortgage and Other Loan Documents, dated September 2, 2021, between the Hotel Borrowers

and Senior Lender (the "**Second Amended Hotel Mortgage**").  True and correct copies of what the Senior Lender filed in the Foreclosure Action as the Second Amended Hotel Note and the Second Amended Hotel Mortgage are attached hereto as **Exhibit 30** and **Exhibit 31,** respectively.

65.     On or about September 2, 2021, the Senior Lender and Hotel Borrowers also entered into the First Amendment to Second Priority Mortgage and Second Priority Assignment of Leases and Rents (Golf Villas Property for Hotel Loan), dated September 2, 2021, between the Villas Borrower and the Senior Lender (the "**First Amended Second Priority Mortgage for Hotel Loan**" and together with the Second Amended Hotel Loan Agreement, Second Amended Hotel Note, Second Amended Hotel Mortgage, and all other documents evidencing, securing or executed in connection with the Second Amended Hotel Loan Agreement are hereinafter referred to collectively as the "**Second Hotel Amendments**").  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the First Amended Second Priority Mortgage for Hotel Loan is attached hereto as **Exhibit 32**.

66.     The Second Hotel Amendments contemplate that the Hotel Borrowers would sell twenty-one (21) of the Estate Lots (the "**Phase I Lot Sale**") on or about September 2, 2021, and reaffirmed that the proceeds from the Phase I Lot Sale would be distributed and applied in accordance with the Partial Release Agreement – including repayment of the principal balance of the Hotel Loan and unpaid interest thereon.

67.     Upon information and belief, the Phase I Lot Sale occurred on or about September 2, 2021; however, neither the Borrowers nor the Senior Lender provided the Mezzanine Lender with records to confirm that the proceeds from the Phase I Lot Sale were distributed and applied in accordance with the Partial Release Agreement

68.     Upon information and belief, the monetary obligations of the Hotel Borrower were effectively increased under the Original Hotel Loan Agreement to the extent the proceeds from the Phase I Lot Sale were not applied in accordance with the Partial Release Agreement, including repayment of the principal balance of the Hotel Loan and unpaid interest thereon.

69.     Subsequently, the Senior Lender and the Hotel Borrowers entered into that certain Third Amendment to Amended and Restated Loan Agreement and Other Loan Documents, dated December 31, 2021 (the "**Third Amended Hotel Loan Agreement**"), to, among other things, further amend the Original Hotel Loan Agreement to shorten the Maturity Date of the Hotel Loan from December 31, 2022, to July 1, 2022.  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Third Amended Hotel Loan Agreement is attached hereto as **Exhibit 33.**

70.     The shortening of the maturity date of the Hotel Loan is further evidenced by that certain Third Amendment to Mortgage and Other Loan Documents, dated December 31, 2021, between the Hotel Borrowers and Senior Lender (the "**Third Amended Hotel Mortgage**" together with the Third Amended Hotel Loan Agreement, and all other documents evidencing, securing or executed in connection with the Third Amended Hotel Loan Agreement are hereinafter referred to collectively as the "**Third Hotel Amendments**").  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Third Amended Hotel Mortgage is attached hereto as **Exhibit 34**.

71.     The Senior Lender never sought, nor received, consent from the Mezzanine Lender to the Second Hotel Amendments or the Third Hotel Amendments (collectively, the "**Hotel Amendments**").

72.     The Senior Lender never delivered copies of the Hotel Amendments to the Mezzanine Lender at the time they were executed or within a reasonable time thereafter.

73.     Despite entering into the Villas Amendments and Hotel Amendments (collectively, the "**Senior Loan Amendments**") without the consent of the Mezzanine Lender, the Senior Lender filed the Foreclosure Complaint seeking a judgment against the Borrowers for the increased principal amounts of the Villas Loan and interest thereon.  The Senior Lender acknowledges the increases to the principal amount of the Villas Loan as set forth in the following paragraphs from the Foreclosure Complaint:

> **Paragraph 23:** On September 30, 2020, Lender extended to Borrowers a loan in the original principal amount of up to Nineteen Million and No/100 dollars ($19,000,000.00) (as the same has been increased to the new principal amount of up to $24,000,000.00 as described below, the "Villas Loan").

> **Paragraph 24:** The Villas Loan was advanced in accordance with a loan agreement among Borrowers and Lenders dated as of September 30, 2020, as amended pursuant to that certain First Amendment to Loan Agreement and other Loan Documents dated September 2, 2022 which, among other things, evidenced a future advance in the amount of $5,000,000.00, increasing the Maximum Principal Amount from $19,000,000.00 to $24,000,000; as further amended pursuant to that certain Amended and Restated Loan Agreement dated December 31, 2021…

74.     On November 29, 2022, the Mezzanine Lender, through its counsel, sent the Senior Lender a Notice of Default and Request for Balances (the "**Intercreditor Default Notice**") to provide the Senior Lender with notice of the then-known and existing defaults under the Villas Intercreditor Agreement, which included (i) the Senior Lender's failure to obtain the Mezzanine Lender's consent to increase the principal amount of the Villas Loan, and (ii) the Senior Lender's failure to provide copies of amendments, modifications, and other documents related to the Villas Loan.  A true and correct copy of the Intercreditor Default Notice is attached hereto as **Exhibit 35**.

75.     In response to the Intercreditor Default Notice, by letter dated December 21, 2022 (the "**Default Response**"), the Senior Lender, through its counsel, denied that the Senior Lender

was in default of the Villas Intercreditor Agreement and enclosed the Senior Loan Payoff Statement which acknowledged that the Senior Lender had increased the principal amount of the Villas Loan and that the outstanding principal balance of the Villas Loan was allegedly $26,749,000.63.  A true and correct copy of the Default Response is attached hereto as **Exhibit 36**.

76.     As set forth in the Intercreditor Default Notice, the Senior Lender failed to provide the Mezzanine Lender with copies of all modifications and amendments to the Villas Loan Documents including, but not limited to, those documents providing for and evidencing the increases in the principal amount of the Villas Loan, all in violation of Section 7(c) of the Intercreditor Agreement.

77.     On January 6, 2023, the Mezzanine Lender, through its counsel, sent the Senior Lender a Request for Loan Documents (the "**Loan Document Request**") requesting the Senior Lender provide all modifications, amendments and other documents listed in Section 7(c) of the Intercreditor Agreements.  A true and correct copy of the Loan Document Request is attached hereto as **Exhibit 37**.

78.     On January 9, 2023, the Senior Lender, through its counsel, responded to the Loan Document Request (the "**Loan Document Response**") by providing a link to the State Court's website for the Foreclosure Action and, instead of providing the Mezzanine Lender with the requested documents, directed the Mezzanine Lender to locate the requested documents from the Senior Lender's filings in the Foreclosure Action.  A true and copy of the Loan Document Response is attached hereto as **Exhibit 38**.

79.     While the Loan Document Response wholly failed to address the Senior Lender's obligations under Section 7(c) of the Intercreditor Agreements, the Mezzanine Lender, through its

legal counsel, reviewed thousands of pages of voluminous filings in the Foreclosure Action.  As a result of such review, the Mezzanine Lender located copies of the Senior Loan Amendments filed in the Foreclosure Action (with redactions and watermarks) which the Senior Lender had not previously provided to the Mezzanine Lender.

80.     Upon information and belief, the Senior Lender entered into other modifications, amendments and other documents as listed in Section 7(c) of the Intercreditor Agreements that are not available on the State Court's website for the Foreclosure Action and have not been provided to the Mezzanine Lender including, but not limited to, the Second Amended Villas Loan Agreement.

81.     Despite the Mezzanine Lender's subsequent request, as of the filing of this Complaint, the Senior Lender has failed to provide the Mezzanine Lender copies of the Senior Loan Amendments filed in the Foreclosure Action without any redactions and watermarks, the Second Amended Villas Loan Agreement and any other amendments to the Senior Loan Documents.

**Mezzanine Borrower's Default under  Mezzanine Loan Documents and Mezzanine Lender's Actions to Enforce the Pledge Agreement and Sell the Pledged Interests under the UCC**

82.     On August 3, 2022, the Mezzanine Lender sent the Mezzanine Borrower a Default and Acceleration Notice (the "**Mezzanine Default Notice**") informing the Mezzanine Borrower of its Existing Defaults (as defined in the Mezzanine Default Notice) under the Mezzanine Loan Documents, accelerating the Mezzanine Loan and requesting payment of the outstanding amounts owed under the Mezzanine Loan Documents.  A true and correct copy of the Mezzanine Default Notice is attached hereto as **Exhibit 39** and incorporated herein by reference.

83.     There is due and owing under the Mezzanine Loan Documents the following indebtedness (collectively, the "**Outstanding Mezzanine Debt**"): (a) $5,229,722.21 consisting of

the outstanding principal balance of $5,000,000.00, together with, as of January 31, 2023, accrued and unpaid interest at the non-default rate of $104,027.77 and at the default rate of $125,694.44; (b) costs, fees and expenses incurred and continuing to be incurred by the Mezzanine Lender in connection with its enforcement of its rights and remedies under the Mezzanine Loan Documents and the Intercreditor Agreements including, without limitation, legal fees and costs, UCC Sale and advertising costs and UCC, lien, title and other search costs; and (c) continuing unpaid interest at the default rate after January 31, 2023 through the maturity date of the Mezzanine Loan discounted to present value at the time the Mezzanine Lender receives payment in full of the Outstanding Mezzanine Debt.

84.     Under Sections 5(a), 8(c) and 9(a)(i) of each of the Intercreditor Agreements, the Senior Lender acknowledged and agreed that the Mezzanine Lender may exercise its rights and remedies under the Pledge Agreement to foreclose on, realize and transfer the Pledged Interests (defined as the "Equity Collateral" in the Intercreditor Agreements), subject to certain terms and conditions in the Intercreditor Agreements.

85.     As a result of the Mezzanine Borrower's defaults under the Mezzanine Loan Documents, on December 16, 2022, the Mezzanine Lender sent a Notification of Disposition of Collateral (the "**First Disposition Notice**") to the Mezzanine Borrower to, among other things, give notice of the Mezzanine Lender's intention to sell the Pledged Interests at a public sale on February 17, 2023 (the "**Public UCC Sale**") or by a private sale to a third party on or after January 4, 2023, to satisfy the Outstanding Obligations (as defined in the First Disposition Notice) in accordance with the Uniform Commercial Code as adopted by the State of Florida (the "**UCC**"). A true and correct copy of the First Disposition Notice is attached hereto as **Exhibit 40**.

86.     On December 28, 2022, the Mezzanine Lender sent a Second Notification of Disposition of Collateral (the "**Second Disposition Notice**" and together with the First Disposition Notice, collectively, the "**Disposition Notices**") to the Mezzanine Borrower to, among other things, again, give notice of the Mezzanine Lender's intention to sell the Pledged Interests at the Public UCC Sale on February 17, 2023, or by a private sale to a third party on or after February 10, 2023.  A true and correct copy of the Second Disposition Notice is attached hereto as **Exhibit 41**.

87.     The Mezzanine Lender, through its counsel, provided the Senior Lender copies of the Mezzanine Default Notice on August 19, 2022, and the Disposition Notices on December 28, 2022.

88.     The Mezzanine Lender has engaged Newmark & Company Real Estate, Inc. ("**Newmark**") and other professionals to market, advertise and sell the Pledged Interests at the Public UCC Sale scheduled to occur on February 17, 2023, or by private sale to a third party.

89.     Any successful bidder that acquires the Pledged Interests via the foregoing UCC sale will take ownership and control of the Borrowers and need to resolve the claims asserted by the Senior Lender in the Foreclosure Action.

90.     On behalf of the Mezzanine Lender, Newmark has established a data room to provide potential bidders of the Pledged Interests information related to the Borrowers' Property, the Borrowers, the Mezzanine Borrower, the Hotel Loan Documents, the Villas Loan Documents, the Mezzanine Loan Documents, the Intercreditor Agreements, the Senior Loan Payoff Statement and the filings in the Foreclosure Action, to help such bidders evaluate whether to, and how much to, bid on and purchase the Pledged Interests at the Public UCC Sale or by private sale.

91.     Numerous parties interested in bidding on and purchasing the Pledged Interests have reviewed the information in Newmark's data room and requested copies of amendments to the Hotel Loan Documents and Villas Loan Documents and further information about the amounts that the Senior Lender claims are due and owing under the Hotel Loan Documents, the Villas Loan Documents, and any amendments thereto.

92.     The Senior Lender's refusal and/or failure to provide the Mezzanine Lender with all modifications, amendments and other documents listed in Section 7(c) of the Intercreditor Agreements has obstructed and delayed the ability of the Mezzanine Lender and Newmark to provide potential bidders with complete information with respect to the Senior Lender's amendments to the Hotel Loan Documents and the Villas Loan Documents for the purpose of evaluating the Senior Lender's claims, in particular the Senior Lender's increase of the principal amount of the Villas Loan and related interest thereon.

**Proposed Sale of Borrowers' Properties**

93.     The Parent Company's primary asset is the ownership of the Pledged Interests in the Borrowers.

94.     The Borrowers' primary asset is the ownership of the Borrowers' Properties.

95.     Upon information and belief, the Borrowers have entered into an agreement to sell substantially all of the Borrowers' Properties to a third party (the "**Proposed Sale**").

96.     Under Section 9.9 of the Mezzanine Loan Agreement, the Mezzanine Borrower is prohibited, directly or indirectly, from, *inter alia*, transferring, selling or conveying the Borrowers' Properties or any part or interest therein without "first obtaining [Mezzanine] Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and

conditions as lender deems necessary or appropriate, all within [Mezzanine] Lender's sole and absolute discretion, to the extent permitted by Applicable Law."

97.     The Mezzanine Lender has not consented to the Proposed Sale and advised the Mezzanine Borrower and the Senior Lender that the Mezzanine Lender will not consent to the Proposed Sale unless the Outstanding Mezzanine Debt is paid in full.

98.     Upon information and belief, the construction of a 150-key resort hotel is mostly completed; however, no improvements to the remaining 33 estate lots or the 22 golf villas lots have been constructed and no construction has started on the multi-family high rise condominium building.

99.     Upon information and belief, the Borrowers engaged numerous contractors to improve the Borrowers' Properties and have failed to pay, in full, amounts owed to many contractors, which resulted in certain contractors asserting construction or mechanic's liens against the Borrowers' Properties (the "**Mechanic's Liens**").

100.    As a result of the Second Priority Mortgages, the Senior Lender claims that amounts owed by the Borrowers under the Original Hotel Loan Agreement and the Original Villas Loan Agreement, as amended and increased, are cross-collateralized by mortgage liens against all of the Borrowers' Properties.

101.    As asserted in the Final Judgment Motion, the Senior Lender is seeking a final judgment for amounts allegedly owed by the Borrowers under the Senior Loan Documents, as amended, in the combined total amount of not less than $93,443,432.14 (the "**Alleged Senior Debt Amount**").

102.    The Alleged Senior Debt Amount includes the Senior Lender's claims for: (a) the outstanding increased principal amount of the Villas Loan of $26,749,000.63 under the

amendments to the Original Villas Loan Agreement -- which is $7,749,000 above the maximum original principal amount of the Villas Loan under the Original Villas Loan Agreement; and (b) various fees and charges as well as interest at the non-default and default rates on the outstanding increased principal amount of the Villas Loan of $26,749,000.63 totaling in excess of $3,500,000, of which in excess of $1,000,000 is attributable to the Senior Lender's increase of the principal amount of the Villas Loan by $7,749,000.

103.    The Senior Lender, therefore, has increased the Villas Loan by an aggregate amount in excess of $8,749,000 (the "**Prejudicial Villas Loan Increase**") in breach of the Villas Intercreditor Agreement.

104.    As a result of the Prejudicial Villas Loan Increase, upon information and belief, there is insufficient equity in the Borrowers' Properties to pay in full the Outstanding Mezzanine Debt from the net proceeds of the Proposed Sale or the Mezzanine Lender's foreclosure sale of the Pledged Interests under the UCC, if the Senior Lender is paid the Alleged Senior Debt Amount -- inclusive of the Prejudicial Villas Loan Increase -- plus continuing interest, fees and charges thereon, and if the contractors are paid the amount of their Mechanic's Liens.

105.    But for the Senior Lender's Prejudicial Villas Loan Increase without the consent of the Mezzanine Lender, upon information and belief, there would be sufficient equity in the Borrowers' Properties to pay in full the Outstanding Mezzanine Debt from the net proceeds of the Proposed Sale or the foreclosure sale of the Pledged Interests under the UCC.

106.    The Prejudicial Villas Loan Increase has materially diminished the fair value of the Mezzanine Lender's collateral for the Mezzanine Loan and materially prejudiced and adversely affected the Mezzanine Lender's rights under the Villas Intercreditor Agreement and its rights,

security interests, and recourses against the Pledged Interests under the Pledge Agreement and the UCC, as well as against the Mezzanine Loan Guarantor under the Mezzanine Loan Guaranty.

107.     As a result, the Mezzanine Lender has been substantially injured by the Senior Lender's continuing breaches of the Villas Intercreditor Agreement, and is entitled to the compensatory, declaratory, and equitable relief requested in this Complaint.

**FIRST CAUSE OF ACTION**
**(Breach of Contract – Villas Intercreditor Agreement)**

108.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

109.     The Villas Intercreditor Agreement is a valid, binding and enforceable contract by and between the Senior Lender and the Mezzanine Lender.

110.     The Mezzanine Lender has fully complied with all obligations to be performed pursuant to the Villas Intercreditor Agreement, and there are no conditions to or legal excuses for the breaches of the Villas Intercreditor Agreement by the Senior Lender as alleged herein.

111.     Pursuant to Section 7(a) of the Villas Intercreditor Agreement, the Senior Lender was prohibited from amending or modifying the Villas Loan Documents to increase the principal amount of the Villas Loan or materially increase the Villas Borrower's monetary obligations under the Villas Loan Documents or to shorten the maturity date of the Villas Loan, without the consent of the Mezzanine Lender.

112.     Yet in violation of the Villas Intercreditor Agreement without the Mezzanine Lender's consent, the Senior Lender: (a) increased the principal amount of the Villas Loan from up to $19,000,000 to up to $24,000,000 under the First Villas Amendments; (b) shortened the maturity date of the Villas loan from September 30, 2022 to July 1, 2022, under the Second Villas Amendments; (c) further increased the principal amount of the Villas Loan to $33,000,000 under

the Second Villas Amendments; and (d) advanced the total principal amount of at least $26,749,000.63 under the Original Villas Loan Agreement, as amended.

113.    The Prejudicial Villas Loan Increase has materially diminished the fair value of the Mezzanine Lender's collateral for the Mezzanine Loan and materially prejudiced and adversely affected the Mezzanine Lender's rights under the Villas Intercreditor Agreement and its rights, security interests and recourses against the Pledged Interests under the Pledge Agreement and the UCC, as well as against the Mezzanine Loan Guarantor under the Mezzanine Loan Guaranty.

114.    By amending the Villas Loan Documents to shorten the maturity date of the Villas Loan, the Senior Lender materially prejudiced and adversely affected the Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents and destroyed or substantially diminished the value of the Pledged Interests and the Mezzanine Loan by eliminating and impairing the rights of the Mezzanine Lender (or a buyer of the Mezzanine Loan) to cure any defaults under the Villas Loan Documents, as permitted under Section 11 of the Villas Intercreditor Agreement, and to sell the Mezzanine Loan or the Pledged Interests for a higher amount if the Villas Loan had not matured early due to the Senior Lender's amendment.

115.    Furthermore, Section 7(c) of the Villas Intercreditor Agreement provides that the Senior Lender is required to deliver "copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one of more of the Senior Loan Documents" within a reasonable time after execution of the applicable instrument.

116.    The Senior Lender failed to comply with the requirements of Section 7(c) of the Villas Intercreditor Agreement by not providing the Mezzanine Lender with copies of the Senior Loan Amendments and other modifications, amendments, and other documents required to be provided to the Mezzanine Lender.

117.    The Loan Document Response and the Senior Lender's request that the Mezzanine Lender obtain such amendments from exhibits to filings in the Foreclosure Action from the State Court's website did not satisfy the Senior Lender's obligations under Section 7(c) of the Villas Intercreditor Agreement and was also well beyond a reasonable time after the execution of the Senior Loan Amendments and other modifications, amendments, and other required documents.

118.    The Senior Lender's continued failure to provide the Mezzanine Lender with all modifications, amendments and other documents as required under Section 7(c) of the Villas Intercreditor Agreement has obstructed and delayed the ability of the Mezzanine Lender and Newmark to provide appropriate records and information requested by potential bidders interested in participating in, and bidding on the Pledged Interests at the Public UCC Sale or by private sale.

119.    Upon information and belief, the Senior Lender's breaches of the Villas Intercreditor Agreement have caused many bidders to hold-off or lower bidding on purchasing the Mezzanine Loan or the Pledged Interests, all of which has materially impaired the Mezzanine Lender's right and ability to obtain full repayment of the Outstanding Mezzanine Debt by (a) selling the Mezzanine Loan or the Pledged Interests under the Pledge Agreement and UCC,  and (b) enforcing the Mezzanine Loan Guaranty against the Mezzanine Loan Guarantor.

120.    Pursuant to Section 32(b) of the Villas Intercreditor Agreement, the Mezzanine Lender is entitled to "any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender…to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions [of the Villas Intercreditor Agreement].

121.    The Senior Lender's breaches of Sections 7(a) and 7(c) of the Villas Intercreditor Agreement have impaired and jeopardized the Mezzanine Lender's ability to recover the full amount of the Outstanding Mezzanine Debt, thereby causing the Mezzanine Lender to suffer damages in the amount of the Outstanding Mezzanine Debt less any partial payments hereafter received by the Mezzanine Lender as determined by the Court in this action, plus the legal fees, costs and expenses incurred and continuing to be incurred by the Mezzanine Lender in connection with the Senior Lender's breaches of the Villas Intercreditor Agreement, the filing of this Complaint and the prosecution of the Mezzanine Lender's claims against the Senior Lender in this action.

### SECOND CAUSE OF ACTION
**(Breach of Contract – Hotel Intercreditor Agreement)**

122.    The foregoing paragraphs are incorporated herein in their entirety as if fully set forth in full.

123.    The Hotel Intercreditor Agreements is a valid, binding and enforceable contract by and between the Senior Lender and the Mezzanine Lender.

124.    The Mezzanine Lender has fully complied with all obligations to be performed pursuant to the Hotel Intercreditor Agreement, and there are no conditions to or legal excuses for the breaches of the Hotel Intercreditor Agreement by the Senior Lender as alleged herein.

125.    Pursuant to Section 7(a) of the Hotel Intercreditor Agreement, the Senior Lender was prohibited from amending or modifying the Hotel Loan Documents to, among other things, shorten the maturity date of the Hotel Loan, without the consent of the Mezzanine Lender.

126.    Yet in violation of the Hotel Intercreditor Agreement without the Mezzanine Lender's consent, the Senior Lender shortened the maturity date of the Hotel Loan from the September 30, 2022 to July 1, 2022 under the Third Amended Hotel Loan Agreement.

127.    By shortening the maturity date of the Hotel Loan, the Senior Lender has materially diminished the fair value of the Mezzanine Lender's collateral for the Mezzanine Loan and materially prejudiced and adversely affected the Mezzanine Lender's rights under the Hotel Intercreditor Agreement and its rights, security interests and recourses against the Pledged Interests under the Pledge Agreement and the UCC, as well as against the Mezzanine Loan Guarantor under the Mezzanine Loan Guaranty.

128.    By amending the Hotel Loan Documents to shorten the maturity date of the Hotel Loan, the Senior Lender materially prejudiced and adversely affected the Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents and destroyed or substantially diminished the value of the Pledged Interests and the Mezzanine Loan by eliminating and impairing the rights of the Mezzanine Lender (or a buyer of the Mezzanine Loan) to cure any defaults under the Hotel Loan Documents, as permitted under Section 11 of the Hotel Intercreditor Agreement, and to sell the Mezzanine Loan or the Pledged Interests for a higher amount if the Hotel Loan had not matured early due to the Senior Lender's amendment.

129.    Furthermore, Section 7(c) of the Hotel Intercreditor Agreement provides that the Senior Lender is required to deliver "copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one of more of the Senior Loan Documents" within a reasonable time after execution of the applicable instrument.

130.    The Senior Lender failed to comply with the requirements of Section 7(c) of the Hotel Intercreditor Agreement by not providing the Mezzanine Lender with copies of the Hotel Loan Amendments and other modifications, amendments, and other documents required to be provided to the Mezzanine Lender.

131.    The Loan Document Response and the Senior Lender's request that the Mezzanine Lender obtain such amendments from exhibits to filings in the Foreclosure Action from the State Court's website did not satisfy the Senior Lender's obligations under Section 7(c) of the Hotel Intercreditor Agreement and was also well beyond a reasonable time after the execution of the Hotel Loan Amendments and other modifications, amendments, and other required documents.

132.    The Senior Lender's continued failure to provide the Mezzanine Lender with all modifications, amendments and other documents as required under Section 7(c) of the Hotel Intercreditor Agreement has obstructed and delayed the ability of the Mezzanine Lender and Newmark to provide appropriate records and information requested by potential bidders interested in participating in, and bidding on the Pledged Interests at, the Public UCC Sale or by private sale.

133.    Upon information and belief, the Senior Lender's breaches of the Hotel Intercreditor Agreement have caused many bidders to hold-off or lower bidding on purchasing the Mezzanine Loan or the Pledged Interests, all of which has materially impaired the Mezzanine Lender's right and ability to obtain full repayment of the Outstanding Mezzanine Debt by (a) selling the Mezzanine Loan or the Pledged Interests under the Pledge Agreement and UCC, and (b) enforcing the Mezzanine Loan Guaranty against the Mezzanine Loan Guarantor.

134.    Pursuant to Section 32(b) of the Hotel Intercreditor Agreement, the Mezzanine Lender is entitled to "any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender…to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions [of the Hotel Intercreditor Agreement].

135.     The Senior Lender's breaches of Sections 7(a) and 7(c) of the Hotel Intercreditor Agreement have impaired and jeopardized the Mezzanine Lender's ability to recover the full amount of the Outstanding Mezzanine Debt, thereby causing the Mezzanine Lender to suffer damages in the amount of the Outstanding Mezzanine Debt less any partial payments hereafter received by the Mezzanine Lender as determined by the Court in this action, plus the legal fees, costs and expenses incurred and continuing to be incurred by the Mezzanine Lender in connection with the Senior Lender's breaches of the Hotel Intercreditor Agreement, the filing of this Complaint and the prosecution of the Mezzanine Lender's claims against the Senior Lender in this action.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment)**

136.     The foregoing paragraphs are incorporated herein in their entirety as if fully set forth in full.

137.     Under New York Law, "[i]t is well established that while a senior mortgagee can enter into an agreement with the mortgagor modifying the terms of the underlying note or mortgage without first having to notify any junior lienors or to obtain their consent, if the modification is such that it prejudices the rights of the junior lienors or impairs the security, their consent is required." *Shultis v. Woodstock Land Dev. Assocs.*, 188 A.D.2d 234, 236-237 (3d Dept. 1993) (citing *Empire Trust Co. v. Park-Lexington Corp.* 243 A.D. 315, 321 (1st Dept. 1934). "Failure to obtain consent in these cases results in the modification being ineffective as to the junior lienors and the senior lienor relinquishing to the junior lienors its priority with respect to the modified terms." *Id.*; *see also Fleet Bank of N.Y. v County of Monroe Indus. Dev. Agency*, 224 A.D.2d 964, 965 (4th Dept. 1996) ("Where, however, the actions of the senior lienor prejudice the junior lienors

but do not substantially impair their security interest or destroy their equity, the senior lienor will be required to relinquish to the junior lienors its priority with respect to the modified terms[.]")

138.   As set forth above, without the consent of the Mezzanine Lender, the Senior Lender and the Villas Borrower entered into certain amendments to the Villas Loan Documents that increased the principal amount of the Villas Loan from up to $19,000,000 to up to $33,000,000 and shortened the maturity dates of the Villas Loan and the Hotel Loan.

139.   The Mezzanine Lender advanced the principal amount of $5,000,000 under the Mezzanine Loan Agreement before the Senior Lender (a) amended the Villas Loan Documents to increase the principal amount, and to shorten the maturity, of the Villas Loan, and (b) amended the Hotel Loan Documents to shorten the maturity date of the Hotel Loan.

140.   As a result of the Prejudicial Villas Loan Increase and the shortened maturity dates of the Hotel Loan and the Villas Loan, upon information and belief, there is insufficient equity in the Borrowers' Properties to pay in full the Outstanding Mezzanine Debt from the net proceeds of the Proposed Sale or the Mezzanine Lender's foreclosure sale of the Pledged Interests under the UCC, if (a) the Senior Lender is paid the Alleged Senior Debt Amount -- inclusive of the Prejudicial Villas Loan Increase -- plus continuing interest, fees and charges thereon, and (b) the contractors are paid amounts owed under their construction or mechanic's lien claims.

141.   The Prejudicial Villas Loan Increase and shortened maturity dates of the Senior Lender's loans have materially diminished the fair value of the Mezzanine Loan and the Mezzanine Lender's collateral for the Mezzanine Loan – the Pledged Interests -- and materially prejudiced and adversely affected the Mezzanine Lender's rights under the Intercreditor Agreements and its rights, security interests and recourses against the Pledged Interests under the Pledge Agreement

and the UCC, as well as against the Mezzanine Loan Guarantor under the Mezzanine Loan Guaranty.

142.     The Prejudicial Villas Loan Increase and shortened maturity dates of the Senior Lender's loans have caused an actual, material and adverse impact on the relative and agreed upon priorities between the Senior Loan and the Mezzanine Loan under the Intercreditor Agreements to the substantial detriment of the Mezzanine Lender.

143.     The Senior Lender denies that it amended the Villas Loan Documents or the Hotel Loan Documents or failed to provide amendments to the Senior Loan Documents in violation of the Villas Intercreditor Agreement or the Hotel Intercreditor Agreement, respectively.

144.     Upon information and belief, the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties may not result in sufficient proceeds to pay in full the Outstanding Mezzanine Debt to the extent that the Senior Lender may have failed to apply the proceeds from the Phase I Lot Sale to pay down the principal balance of the Hotel Loan and unpaid interests thereon in violation of the Partial Release Agreement, as determined based upon the Senior Lender providing an accounting of such proceeds as requested below.

145.     The Court should declare the rights of the parties under the Intercreditor Agreements and subordinate the amounts claimed due by the Senior Lender under the Senior Loan Documents, as amended, by the Prejudicial Villas Loan Increase and damages caused by the shortened maturity dates of the Senior Lender loans in excess of $8,749,000 in amounts to be determined by the Court, to the Mezzanine Loan until payment in full of the Outstanding Mezzanine Debt.

## FOURTH CAUSE OF ACTION
### (Injunctive Relief)

146.     The foregoing paragraphs are incorporated herein in their entirety as if fully set forth in full.

147.     As set forth above, the Mezzanine Borrower is prohibited from transferring, selling or conveying any interest in the Borrowers' Properties without the prior written consent of the Mezzanine Lender which the Mezzanine Lender has not given.

148.     The Mezzanine Lender has advised the Mezzanine Borrower and Senior Lender that the Mezzanine Lender will not consent to the Proposed Sale unless the Outstanding Mezzanine Debt is paid in full.

149.     Upon information and belief, the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties will not result in sufficient proceeds to pay in full the Outstanding Mezzanine Debt principally because the Alleged Senior Debt Amount includes the Prejudicial Villas Loan Increase in excess of $8,749,000.

150.     In addition, upon information and belief, the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties may not result in sufficient proceeds to pay in full the Outstanding Mezzanine Debt to the extent that the Senior Lender may have failed to apply the proceeds from the Phase I Lot Sale to pay down the principal balance of the Hotel Loan and unpaid interests thereon in violation of the Partial Release Agreement, as determined based upon the Senior Lender providing an accounting of such proceeds as requested below.

151.     Upon information and belief, the Senior Lender is requiring payment of and will be paid the full amount of the Alleged Senior Debt Amount from the proceeds of the Proposed Sale or from any other private sale or foreclosure sale of Borrowers' Properties.

152.    The payment to the Senior Lender of the Alleged Senior Debt Amount from the proceeds of the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties will violate the Villas Intercreditor Agreement because it will include payment of the Prejudicial Villas Loan Increase in excess of $8,749,000 which this Court should subordinate to the Mezzanine Loan until the Mezzanine Lender receives payment in full of the Outstanding Mezzanine Debt.

153.    The Mezzanine Lender has a substantial likelihood of succeeding on the merits of its claims for breach of the Intercreditor Agreements and declaratory relief against the Senior Lender.

154.    To protect and enforce the rights of the Mezzanine Lender and ensure that the Mezzanine Lender realizes upon the Mezzanine Lender's claims for breach of the Intercreditor Agreements and declaratory relief against the Senior Lender, this Court should order equitable relief: (a) except as provided in Paragraph 153(b) below, enjoining the Senior Lender and all persons or entities acting in concert with the Senior Lender from transferring, disbursing, distributing or paying to any person or entity an amount in excess of $8,749,000 on account of the Prejudicial Villas Loan Increase as determined by the Court (the "**Subordinated Senior Debt Amount**") that the Senior Lender receives from the proceeds of the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties; and (b) ordering and directing the Senior Lender and all persons or entities acting in concert with the Senior Lender to turnover and deliver the Subordinated Senior Debt Amount to the Clerk of Court for the Southern District of New York to be held in an interest-bearing account(s) pending further order of this Court.

155.    Section 33 of each Intercreditor Agreement provides:

> Injunction.  Senior Lender and Mezzanine lender each acknowledge
> (and waive any defense based on a claim) that monetary damages

are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other. Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

156.    Absent the Court's granting of the foregoing injunctive relief, the Mezzanine Lender will suffer immediate and irreparable injury and lacks an adequate remedy at law as agreed to and recognized by the parties in Section 33 of each Intercreditor Agreement.

157.    The Court's granting of the foregoing injunctive relief is in the public interest which favors the enforcement of the Intercreditor Agreements to prevent the Senior Lender from amending the Senior Loan Documents (a) without the Mezzanine Lender's consent and without providing copies thereof to the Mezzanine Lender, and (b) in ways that, as set forth in this Complaint, materially prejudice the Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents and impair its ability to enforce and realize upon the Pledged Interests and the Mezzanine Guaranty Agreement to secure payment in full of the Outstanding Mezzanine Obligations.

**WHEREFORE,** the Mezzanine Lender respectfully requests that this Honorable Court grant judgment on the foregoing causes of action in its favor and against the Senior Lender as follows:

1)      On the First Cause of Action, awarding compensatory damages against the Senior Lender in the full amount of the Outstanding Mezzanine Debt as determined by Court but in all events no less than $5,000,000, plus prejudgment interest at the non-default and default rates through the maturity date of the Mezzanine Loan discounted to present value at the time the Mezzanine Lender receives payment in full, together with reasonable attorneys' fees, costs of suit,

and all other costs and expenses incurred by the Mezzanine Lender to enforce its rights and remedies under the Mezzanine Loan Documents and the Intercreditor Agreements;

2)     On the Second Cause of Action, awarding compensatory damages against the Senior Lender in the full amount of the Outstanding Mezzanine Debt as determined by Court but in all events no less than $5,000,000, plus prejudgment interest at the non-default and default rates through the maturity date of the Mezzanine Loan discounted to present value at the time the Mezzanine Lender receives payment in full, together with reasonable attorneys' fees, costs of suit, and all other costs and expenses incurred by the Mezzanine Lender to enforce its rights and remedies under the Mezzanine Loan Documents and the Intercreditor Agreements;

3)     On the Third Cause of Action, declaring (a) the rights of the parties under the Intercreditor Agreements with respect to the Senior Lender's amendments to the Senior Loan Documents that increased the principal amount, and shortened the maturity, of the Villas Loan, and shortened the maturity of the Hotel Loan, (b) that the amendments to the Senior Loan Documents without the Mezzanine Lender's consent that increased the principal amount and shortened the maturity of the Villas Loan, and that shortened the maturity of the Hotel Loan, (i) materially prejudiced and impaired the Mezzanine Lender's rights and security interest in the Pledged Interests under the Pledge Agreement and rights and remedies under the Mezzanine Loan Guaranty and the Mezzanine Loan Agreement, and (ii) are ineffective and unenforceable as to the Mezzanine Lender, (c) that the Senior Lender provide the Mezzanine Lender a full accounting of proceeds from the Phase I Lot Sale (the "**Phase I Lot Sale Accounting**"), (d) that the Senior Lender's claims against the Borrowers, and the indebtedness claimed owed by the Borrowers to the Senior Lender under the Senior Loan Documents, as amended, each in the Subordinated Senior Debt Amount and amounts that materially increased the monetary obligations of the Borrower

based upon the Phase I Lot Sale Accounting (the "**Misapplied Phase I Lot Sale Proceeds Amount**"), be fully subordinated to the Outstanding Mezzanine Debt owed the Mezzanine Lender until payment in full thereof, and (d) that the Senior Lender shall, when and as collected or received by Senior Lender, hold in trust for, and turn over to, the Mezzanine Lender such portion of the Subordinated Senior Debt Amount and the Misapplied Phase I Lot Sale Proceeds Amount as this Court determines is necessary to pay in full the Outstanding Mezzanine Debt owed the Mezzanine Lender;

4)      On the Fourth Cause of Action: (a) except as provided in 4(b) below, enjoining the Senior Lender and all persons or entities acting in concert with the Senior Lender from transferring, disbursing, distributing or paying to any person or entity the Subordinated Senior Debt Amount and the Misapplied Phase I Lot Sale Proceeds Amount that the Senior Lender receives from the proceeds of the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties; and (b) ordering and directing the Senior Lender and all persons or entities acting in concert with the Senior Lender to turnover and deliver the Subordinated Senior Debt Amount and the Misapplied Phase I Lot Sale Proceeds Amount that the Senior Lender receives from the proceeds of the Proposed Sale or any other private sale or foreclosure sale of Borrowers' Properties to the Clerk of Court for the Southern District of New York to be held in an interest-bearing account pending further order of this Court in accordance therewith; and

5)      Such further relief as this Court deems just, equitable and proper under the circumstances.

Dated: New York, NY

February 16, 2023

By:   <u>/s/ James C. Vandermark</u>
James C. Vandermark, Esq.
Sabina Corrado, Esq.
White and Williams LLP
7 Times Square, Suite 2900
New York, NY 10036
646.837.5791 / 212-714-3074
vandermarkj@whiteandwilliams.com
corrados@whiteandwilliams.com
*Attorneys for  Plaintiff Banyan Cay*
*Resort Fund, LLC*